NORTHERN DISTRICT OF TEXAS

FILED

SEP 1 2 2014

CLERK, U.S. DISTRICT
By _____

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ROBERT ARMSTRONG, §
§
Petitioner, §
§
v. § No. 4:13-CV-274-A
§
WILLIAM STEPHENS, Director, §
Texas Department of Criminal §
Justice, Correctional §
Institutions Division, §
§
Respondent. §

## MEMORANDUM OPINION
## and
## ORDER

This is a petition for a writ of habeas corpus pursuant to
28 U.S.C. § 2254 filed by petitioner, Robert Armstrong, a state
prisoner confined in the Correctional Institutions Division of
the Texas Department of Criminal Justice (TDCJ), against William
Stephens, director of TDCJ, respondent. After having considered
the pleadings, state court records, and relief sought by
petitioner, the court has concluded that the petition should be
denied.

### I. Factual and Procedural History

On December 10, 2007, petitioner waived his right to a jury
trial and entered an open plea of guilty to murder with a deadly
weapon in the 213th Criminal District Court of Tarrant County,

Texas.  Clerk's R. 151, ECF No. 9-8.  His sentencing was deferred

pending preparation of a pretrial sentencing report.  Clerk's R.

149, ECF No. 9-8.  Sentencing hearings were held on April 11 and

April 14, 2008.  Reporter's R., vols. 1-5, ECF Nos. 10-1 thru 10-

5.  Following the April 14 hearing, the trial court assessed

petitioner's punishment at 45 years' confinement.  Reporter's R.,

vol. 5, 108, ECF No. 10-5.  Petitioner appealed, but the Second

District Court of Appeals of Texas affirmed the trial court's

judgment.  *Ex parte Armstrong,* No. WR-79,177-01 (hereafter

referred to as "SH"), SH 141-45, ECF No. 10-10.  Petitioner did

not file a petition for discretionary review in the Texas Court

of Criminal Appeals, but he did file a state habeas application,

raising the claims presented herein, which was denied by the

Texas Court of Criminal Appeals without a hearing on the findings

of the trial court.  Pet. 6, ECF No. 1; *Ex parte Armstrong,* No.

WR-79,177-01, SH cover, 7-8, ECF No. 10-10.

Petitioner's trial counsel gives the following description

of the crime in his affidavit filed in the state habeas

proceedings:

> [Applicant] and his friend Devlin Finley, were charged
> with having murdered Stephen Hughett on March 13, 2006,
> essentially by beating him to death (by hitting with
> hands, hitting with a BB gun or kicking with his foot)
> and then taking Hughett to a remote location in an

attempt to hide the evidence.  The location of the
beating was the house of a Chris Foster, with whom the
deceased was rooming. [Applicant's] mother Marsha was
engaged to Mr. Foster and also lived at the house.
Both Foster and Marsha Armstrong were present at the
house during the altercation.

Two female witnesses were at the house at the time of
the altercation; one had been with Mr. Hughett in his
bedroom when Robert Armstrong and Devlin Finley burst
in and began to fight with Hughett.  This witness fled
outside the house, where Marsha Armstrong allegedly
kept her from leaving the premises.  This witness
claimed to have heard the scream of the deceased man
during the thirty minute period and to have witnessed
conversations between Robert Armstrong and his mother
about how to dispose of Mr. Hughett.

The second female witness was asleep in the bedroom
close to Mr. Hughett's and was awakened by the sounds
of the altercation.  She hid in a closet, but could
still hear the commotion.  She stated that later, she
was told by Chris Foster that the deceased had "pretty
much been beaten to death," and he told her to say to
anyone who asks that she had been asleep and had heard
nothing.   Foster also told this witness a fabricated
story of the deceased having left with some unknown
persons, although in fact, he had witnessed and aided
[Applicant] and Devlin Finley place Mr. Hughett in a
pick-up truck and leave with him.

Both of these female witnesses reported their
information to the police.  Ultimately, Marsha
Armstrong was charged as a party to the murder of Mr.
Hughett and Mr. Foster was charged with tampering with
physical evidence.

Mr. Hughett's body was not found until 14 days later in
a deep wooded ravine in a remote area of Ft. Worth,
west of Foster's house.  Mr. Hughett's face and other
parts of his body had been scavenged by animals.

3

SH 63, ECF No. 10-10.

## II. Issues

Petitioner raises two grounds for habeas relief, wherein he claims that his guilty plea was not knowingly and voluntarily made and that he received ineffective assistance of trial counsel. Pet. 6, 8, ECF No. 1. Specifically, petitioner alleges—

> Armstrong testified that in the course of a confrontation with Hughett, the deceased, he struck Hughett on the arm with a BB gun, exchanged punches with him, and kicked him. After the confrontation, Hughett merely had a bloody nose and seemed a little dazed." Thereafter, Armstrong and another person put Hughett in the bed of Armstrong's truck and took him "a little ways away from the house," not intending to dump him someplace where he would die and never be found. Armstrong testified that he removed a still-alive Hughett from his truck, placed him on the edge of the road, and left. The body was found in a wash out, some 8 feet below the roadway. Apparently, Hughett had either rolled or walked off the embankment. The crime scene report indicated that the drop from the bridge to the concrete slab at the bottom of the ravine was eight (8) feet eight (8) inches. The position of the body when found was consistent with the body being washed downstream by the heavy runoff of rainfall which happened between the time of the assault of the finding of the body[.] At trial, the medical examiner Dr. Marc Krouse explained these findings, stating he found the cause of death to be blunt force trauma and ruled the death [a] homicide. Some of the injuries observed were equivalent to an 8-10 fall. Armstrong would never had pled guilty [had he known this and] had his attorney investigated the case and told him that the victim died in a fall.

4

Pet. 6, 8, ECF No. 1.

### III. Rule 5 Statement

Respondent believes that Petitioner has sufficiently exhausted his state court remedies as to the claims presented and that the petition was timely filed. Resp't's Answer 5, ECF No. 11; 28 U.S.C. §§ 2244(d)(1), 2254(b)(1)(A).

### IV. Discussion

#### *Legal Standard and for Granting Habeas Corpus Relief*

A § 2254 habeas petition is governed by the heightened standard of review provided for by the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established Supreme Court precedent or that is based on an unreasonable determination of the facts in light of the record before the state court. *Harrington v. Richter,* 562 U.S. 86, 131 S. Ct. 770, 785 (2011); 28 U.S.C. § 2254(d)(1)-(2). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 131 S. Ct. at 786.

Additionally, the statute requires that federal courts give

5

great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. The applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000). Typically, when the Texas Court of Criminal Appeals denies relief in a state habeas corpus application without written opinion, as in this case, it is an adjudication on the merits, which is entitled to the presumption. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir.2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

### Petitioner's Claims

Petitioner claims that his guilty plea was not knowingly and

---

[1]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

voluntarily made because, had he known "[s]ome of the [victim's]
injuries were equivalent to an 8-10 fall" and had counsel, Paul
Conner,[2] "investigated the case and told him that the victim died
in a fall," he would not have pleaded guilty.

The state habeas judge, who also presided at petitioner's
trial, conducted a hearing by affidavit.  Petitioner presented
his affidavit, and the affidavits of his father, Charles
Armstrong, and Dr. Lindsey Thomas.  SH 39-44, 86-87, ECF No. 10-
10.  Petitioner gave his account of Conner's representation as
follows:

> I first met with Mr. Paul Connor after I had been
> arrested and transfered [sic] to the Tarrant County
> jail.  He asked me about the events that occured [sic]
> leading up to my arrest and I did answer him as best I
> could.  Shortly after I had posted bond I met with Mr.
> Connor at a docket call where he explained the contract
> for retention of his services and that his fee would be
> twenty-thousand dollars.  Mr. Conner and I began
> meeting at docket calls I was required to attend and
> would speak briefly.  Also I would visit his office
> about once a month to review materials he had aquired
> [sic] and discuss them.  Very seldom would Mr. Connor
> comment on what the prosecution's stance was and only
> twice did he mention the prosecution's offerings as
> part of a plea agreement.  Once was very early on when
> [he] stated that the prosecution was offering ten
> years, which he quickly dismissed and again much later
> stated that the offer was twenty-years, but that we
> could do better.  That was the extent of his counsel on

---

[2]The court notes that counsel's last name is spelled as both "Conner"
and "Connor" in the record.

that subject and to my knowledge.  Mr. Connor never
pursued any negotiations with the prosecution.  Mr.
Connor did advise the hiring of a private investigator
named John Ladd and that an upfrint [sic] fee of one
thousand dollards [sic] would be required, which I did
pay.  I was never informed as to what exactly Mr. Ladd
was investigating or what if any his findings were.  At
a meeting [in] Mr. Conner['] s office we discussed where
Mr. Hughett was found and reviewed photographs of the
scene.  At a later date Mr. Conner, Mr. Ladd and I
visited the scene where Mr. Hughett was found.  I did
inform Mr. Conner that I had not known the area and did
not know that the ravine where Mr. Hughett was found
was there.  I belived [sic] that Mr. Hughett somehow
fell into the ravine after I left him.  I asked Mr.
Conner if he had spoken to the medical examiner, Dr.
Krause who had performed the autopsy and ruled on the
cause of death?  He said he had but there wasn't
anything there to work with.  At my sentening [sic] Dr.
Krause[3] did in fact testify that Mr. Hughett's injuries
wre [sic] consistent with an eight to then foot fall.
I continued to meet with Mr. Connor and review
information in the previously mentioned manner for over
a year.  As the scheduled date for the trial to begin
approched [sic] my contact [with] him became more
frequent a this date approached.  It was very important
that I speak with him as we had not discussed any
defense strategy or what I should expect.  There had
been no preperation [sic] for trial of any sort that I
know of.  When I contacted Mr. Conner's office I was
always told he was unavailable, that he had been very
busy, and that he would get back to me.  This went on
for over two month.  Finally, three day before the
trial was schedule[d] to begin I received a call from
his office wanting to set up an appointment for the
next day, Saturday with the trial set to begin on
Monday.  At this meeting, which my father was also
present at Mr. Conner advised me that it would be
better to go before the judge who would see that this

---

[3]The court notes that Dr. Krouse's name is spelled as both "Krouse" and
"Krause" in the record.

situation did not merit a server [sic] punishment and that I was a very good candidate for probation. Both my father and I are inexperienced in legal affairs and had to trust in the advise [sic] of the attorney. The fact that it was only days before the trial and the weekend having no other options discussed added to my agreeing to go this route. Mr. Conner to my knowlegge [sic] had not discussed this course of action with the prosecution but assured me that they would not object to it. A few hours after this meeting Mr. Conner called me on my cellphone [sic] and informed me of the prosecution's response to this decided course of action. Mr. Conner stated that the prosecution would allow me to enter an open plea to either the murder charge or the aggravated kidnapping charge and in either case drops the other charge and the tampering with evidence charge. I was told by Mr. Conner that he needed an immediate answer to move forward. I did try to get an explanation as to the diiference [sic] the two option[s] without success. Mr. Conner did inform me that either charge was a first degree felenoy [sic] carrying a sentence range of five to ninety-nine years in prison. He faild [sic] to give me any pros or cons to either choice or any defense I might have. Mr. Conner reiterated numerous times that he neede [sic] a decision immedately [sic], giving me no time to weigh these options or consult with my family or anyone else. I pled to the murder charge over the aggrvated [sic] kidnapping charge, and did this because while the murder charge was not discussed in much detail, the aggrvated [sic] kidnapping charge had not been discussed at all. Being suddenly faced with the aggravated kidnapping charge it did sound worse than the murder charge that I had been dealing with beign [sic] charged with for almost two years. If it had been explained to me why I could not have been guilty of the murder charge that because Mr. Hughett's death was the result of injuries sustained from an accidental fall rather than from the fight and the definition of serious bodily injury had been made clear to me I would not have pled guilty to this charge. Never did I intend to cause the death of Mr. Hughett or leave him in an unsafe place and I have always maintained this.

9

SH 42-43, ECF No. 10-10.

Charles Armstrong gave his account of Connor's

representation as well.  He avers-

> Early in this case when we first met and hired Paul
> Connor and signed a contract for representation, he
> told us that the fee would be $25,000.00 . . . .  He
> said that fee would cover 250 . . . billable attorney
> hours; if we exceed 250 hours, he would bill us by the
> hour.  The only other expense that was incurred to my
> knowledge was $1000.00 . . . that Robert paid for a
> private investigator.  I'm not sure what investigation
> was done.  Neither Robert nor I had that kind of cash
> available, but I was worried that if we let a court-
> appointed attorney handle the case, Robert might not
> get effective counsel.  I cashed in retirement funds,
> paid penalties and taxes, and paid Mr. Connor his fee
> in one payment.

> Robert and I met with Paul Connor on a Saturday, at his
> request, two days before the trial was to begin on the
> following Monday.  Mr. Connor advised Robert to plead
> guilty.  After well over a year, this was the first
> mention of a plea.  When I asked Connor why he would
> ask Robert to plead guilty to something he did not do,
> Connor told us, "Robert never had another choice than
> to plead guilty after Devlin Finley had given a
> statement against him."  When I argued that Robert was
> not guilty of the charges against him, Connor said that
> did not matter.  He said that Robert was charged with
> murder and if he went to trial he would, without a
> doubt, be found guilty and go to prison.  Connor told
> us that his only chance to stay out of prison was to
> enter an open plea of guilty before the Court.  Connor
> told us the State was asking for 20 . . . years, which
> was absurd, given the circumstances.  He said that
> there was no way Robert would receive that kind of
> sentence from the judge.  He said that he was of the
> opinion that Robert would be given probation with
> possibly a year in the county jail as a condition of
> probation due to the circumstances of the case.  He

told us again that this was Robert's only hope.  An
open plea to the judge would allow the judge to
consider the probation alternative.  Mr. Connor also
told us that we had to make this decision on-the-spot
within an hour.  He said the prosecutor was standing by
waiting for Connor's call.  Robert and I reluctantly
agreed to Connor's proposal, not knowing better at the
time, without having time to consider or consult with
anyone else, and without knowing that he was not
telling us the truth about the situation.  I now
believe that Finley never made a statement against
Robert.  On the contrary, he was prepared to testify on
Robert's behalf and had taken a lie detector test and
passed it as to what happened.  I believe Mr. Connor
deceived us both and pressured Robert into pleading
guilty to something he did not do.

I went to court with Robert the day he entered his
plea.  As we stood in the hall, I looked at Mr. Connor
and asked him, "Are you sure this is what we should be
doing?"  He nodded that yes, it was.  I argued that
this did not seem right, to plead guilty to something
the [sic] he did not do and asked him if he thought my
son was guilty.  Connor told me he did not feel like
Robert was guilty, but it did not matter what he
thought–that this was the only way to keep Robert out
of prison.  There was no other option.  I do not
believe this was good advice.

When Robert's sentencing hearing was underway, Mr.
Connor did little to defend Robert.  All that Mr.
Connor offered were character witnesses on Robert's
behalf.  He did not challenge what the prosecution was
presenting.  I was a character witness for Robert along
with several others.  When interviewing us as character
witnesses, Connor told us that for whatever reason, to
not say, "Robert did not do this," or, "he is not
guilty."  He did not tell us that the judge would have,
and could have stopped the hearing and withdrawn
Robert's plea as involuntary.  When the medical
examiner testified that Mr. Hughett had died from a
head injury equivalent to an eight-to-ten-foot fall,
Mr. Connor would not question the medical examiner as

11

to whether it could have been an accidental fall where
Mr. Hughett had fallen on his own. Connor told us he
had a past history with that medical examiner and that
it could harm Robert if he questioned the medical
examiner's opinion. Again, Mr. Connor did not explain
to us that the judge would have, and could have ,
withdrawn Robert's plea as involuntary. I now
understand things that neither my son nor I had
knowledge of before, and they are things about which we
hired an attorney to advise us. There was not only a
lack of advising us, but also, at times, he did not
explain things properly and withheld information which,
if known, could have changed our decisions. Mr. Connor
had also convinced my son that by definition of the
law, he was guilty. I now believe that is not true. I
feel as though something backfired on Mr. Connor, and
he was completely unprepared to deal with it, and my
son is paying the price. Mr. Connor left the court on
the first day of trial at the lunch break, seemingly
angry, and told me in passing that none of this was
supposed to be happening.

My son is serving a 45-year . . . sentence for a crime
he did not commit. Not only is he suffering, but also
his wife and children are suffering as well. I have
always had respect for our legal system, but now I find
myself guilty in this circumstances of telling my son
to do something he should never have done–plead guilty
to something he did not do because I put my trust in
Paul Connor.

SH 39-41, ECF No. 10-10 (citations to the record omitted).

Nearly two years later petitioner presented a second

affidavit from his father, wherein Charles states:

On September 18, 2012 I spoke with the co-
defendant Finley. When I asked about a statement to
the DA, he said he would not sign, or ever did sign
anything. They wanted him to sign a statement saying
Robert threw the guy in the culvert and it was all
Robert. When he refused to do that he says they got

12

sort of "pissy" with him.  He says he told them he had
some part of this and told them what it was, and this
guy was OK when they left him and they expected him to
be OK later.  Something he said that is not in anything
else we have is that the guy was sitting up on the
tailgate of the truck when they got to where they left
him, and that he could see his form breathing from
where he was.  He had said before to Connor "that he
could see the guy breathing in the dark, could see his
form moving up and down" . . . had left out he was
sitting up on the tailgate.

   I had him read the polygraph, I told him how
important this was and I explained what I meant.  After
the initial interview, how many questions they asked
him with wires hooked up.  He says he could not say for
sure but that it lasted at least half an hour and maybe
even an hour, that he was very nervous about the whole
thing and tried to stay calm and control his breathing,
he made some comment then about some drugs and the
test.  I did not want to call alert to drugs and the
test and thought I would get back to that later some
how but I did not.  When I asked again, so it was with
out a doubt more than three questions he said yes.

   I had him read the transcript with Conner, that
took a while.  He said the best he can recall, that it
appears to be accurate and unedited.  He told me that
the reason he talked to the DA was that his attorney
wanted more money that he did not have, another
$5000.00 after the initial $50,000.

SH. 88-89, ECF No. 10-10.

   Finally, petitioner presented the August 2012 affidavit of

Dr. Lindsey Thomas.  Dr. Thomas stated in the affidavit—

   I address this affidavit to the question of
whether it is more likely that Mr. Hughett sustained
his head injuries, which Dr. Krouse testified and I
agree were contributing factors to Mr. Hughett's death,
from a beating or a fall.

13

Given that Mr. Hughett's body was found in a
ravine/creek area, approximately 30 feet north of and 8
½ feet below the level of a bridge on the roadway,
there is strong circumstantial evidence at the scene to
suggest that his head injuries occurred from a fall.

One of the ways that forensic pathologists attempt
to differentiate head injuries from falls versus from
blows to the head are the location of cerebral
contusions (bruises on the brain) and whether they are
"coup" (on the same side as the impact site) or
"contra-coup" (on the opposite side of the impact
site). Due to decomposition, in Mr. Hughett's case it
is difficult to determine where the impact site was.
However, looking at the photographs of the reflected
scalp, it appears that there is more subgaleal
hemorrhage (bleeding on the undersurface of the scalp)
on the right side of Mr. Hughett's head than on the
left. Dr. Krouse states this in his testimony that
"some areas of discoloration of the scalp and temporal
muscle that are suspicious of blunt force injury"
indicate that the site of Mr. Hughett's impact was most
likely the "right side of the head". Given that Dr.
Krause found "bruises of the brain in the left temporal
lobe, left side", these contusions (bruises) would be
contra-coup (on the opposite side) and therefore more
likely to have occurred from a fall from a direct blow.

I would again state that it is my opinion, to a
reasonable degree of medical certainty, that there is
no evidence to support a conclusion that the injuries
that cause Mr. Hughett's death are more likely to have
been caused by a beating than from a fall. While I
believe the two possibilities are more or less equally
likely, if I had to choose the more likely scenario, I
would choose the fall for the reasons state above.

If I had been contacted I would have appeared at
trial and testified as set forth above.

SH 86-87, ECF No. 10-10.

Trial counsel, licensed since 1978 and board-certified in

14

criminal law since 1983, responded to petitioner's allegations in

a lengthy and detailed affidavit as follows:

> I was retained to represent Robert Armstrong by his
> father Charles Armstrong on May 19, 2006, two days
> after Robert had been arrested for Murder.  I met with
> Robert the next day, Saturday, May 20, 2006, at the
> Tarrant County Jail.  Shortly thereafter, Robert was
> released from jail on bond.
>
> On June 14, 2006, I engaged Mr. John Ladd as my private
> investigator to aid me in Robert's defense.  Mr. Ladd
> is a retired detective from the Ft. Worth Police
> Department who had many years experience in homicide
> and major case investigations.  He has subsequently
> also had many years experience as a defense
> investigator and is regularly used in Capital Murder
> defense.  He is highly regarded by the criminal defense
> bar as well as the Tarrant County criminal courts.  He
> remained my investigator on this case for the entire
> twenty-three months of my representation of Robert
> Armstrong.
>
> Robert Armstrong was originally indicted in Cause No.
> 1022516 for the first degree Murder of Stephen Hughett,
> both intentionally or knowingly and by intending to
> cause serious bodily injury and the commission of an
> act clearly dangerous to human life that caused Mr.
> Hughett's death.  Six months later, Tarrant County re-
> indicted him in Cause No. 1022516, essentially adding a
> second degree felony charge of Tampering with Physical
> Evidence – the body of the deceased.  After another six
> months, Mr. Armstrong was re-indicted yet again in
> Cause No. 1077559R, adding (a.) another manner of
> commission of death – by kicking with his foot – to the
> already alleged hitting with hands or by hitting with a
> BB gun), (b.) the charge of Aggravated Kidnapping and
> (c.) a Deadly Weapon notice.  Mr. Armstrong remained
> charged in all three cause numbers until final
> disposition.
>
> .  .  .

15

LEGAL DEFENSE ACTIONS

Prior to Armstrong's release on bond, I had interviewed
Jennifer Armstrong, Applicant's wife, at length about
what she knew of the facts and the history of the
participants' relationships.  Upon his release, I
conducted a lengthy interview with my client, that when
typed in question-answer form covered 23 pages.
Throughout my representation, I was in frequent
communication with Mr. Armstrong, his wife and Mr.
Armstrong's father.  As Applicant states in his
affidavit, throughout the case, he would meet with me
not only at court settings, but at monthly meetings in
my office.  During high preparation times, we would
meet more frequently.

It was not until the end of June, 2006 that I received
access to the majority of the prosecution police
reports.  From that point, I shared all information
gained from these reports and other discovery with my
client in conformity with the District Attorney's open
file policy rules.  Mr. Armstrong was permitted to read
and take his own notes on all discovery that I received
from the prosecutor, which he did.  Over the 18 month
period prior to the December 2007 trial date, we
discussed the contents of the prosecution's case,
charges against him, his rendition of the facts and our
defense strategy.

By the end of the case, my file contents numbered in
excess of 2600 pages of materials.  In preparation for
Mr. Armstrong's trial, I had reviewed and studied many
police reports from two different police agencies
involved in this investigation (the location of the
assault and the location of the body were in two
different jurisdictions), including prosecution witness
statements, computer records and items seized from
various searches of Armstrong's vehicles, house,
computers and cell phones.

I reviewed and researched the autopsy report and in May
of 2007, personally interviewed Dr. Marc Krouse at the
Medical Examiner's office for approximately two hours

regarding his findings and opinions, all of which were shared with Mr. Armstrong.

There were DNA reports to review which initially did not link to Mr. Armstrong, although later testing of previously untested garments did link to him.

Together with our investigator, Mr. Armstrong and I went to the house where the attack occurred and traveled the route he and co-defendant Devlin Finley had driven in transporting Mr. Hughett to the rural area, and together investigated the area in which the body was found.  In addition to the times with Mr. Armstrong, my investigator and I returned to both the crime scenes on multiple occasions to make measurements and prepare photos and exhibits.

As part of our investigation, I traveled with the investigator to locate prosecution witnesses on multiple occasions, including to a rural address, an apartment complex and multiple trips to the Salvation Army temporary residence quarters.  The deceased's and the witnesses' backgrounds were investigated as well.

In addition, I conducted multiple conversations with attorneys for Mr. Armstrong's co-defendants; I also interviewed by phone co-defendant Devlin Finley in Florida, after we were informed of his agreement to testify against Mr. Armstrong.  Throughout my representation, there was consistent contact with the prosecutors concerning new discovery, pre-trial motions and negotiations.

**Ground One: Armstrong's Plea of Guilty Was Not Knowingly and Voluntarily Made.**

. . .

[Mr. Armstrong plead guilty to Count I, *Paragraph 2* of the third and last indictment, Cause No. 1077559R; Applicant plead [sic] guilty to intentionally, with the intent to cause serious bodily injury to Mr. Hughett, committing an act clearly dangerous to human life that

17

caused Mr. Hughett's death.

By written agreement in the plea admonishments, the remaining counts of Aggravated Kidnapping and Tampering with Evidence in Cause No. 1077559R were waived with prejudice against refiling and the first and second indictments were to be dismissed with prejudice against refiling.]

LACK OF NEGOTIATION COMPLAINT

Robert Armstrong states that I never pursued any negotiations with the prosecution.

**Response:** That is incorrect.  From the very beginning, I warned Mr. Armstrong that with three co-defendants in his case, someone would try to negotiate a deal with [the] state to testify against the others.  After I obtained the police reports and witness statements, I was able to make a preliminary assessment of the strength of the prosecution's case.  A weakness existed in placing the defendant as one of the two assailants by direct identification, although certain information and descriptions could be used by the prosecution to prove his presence by circumstantial evidence.  When the first DNA reports were made available to the defense, there was no link to Mr. Armstrong, but there was more testing indicated.

In September of 2006, the prosecutor invited me to discuss the possibility of a plea and testimony against the other defendants.  Mr. Armstrong and I did discuss it and he refused.  His posture was that because he had involved his friend Devlin Finley in this crime, he would not testify against him.  Neither would he testify against his mother.  Testifying only against Chris Foster was not a workable alternative.  I warned him that the prosecution might easily "flip" Foster, but that Foster's credibility was severely undermined by his having given three versions of the facts to two police agencies.  I could not estimate what the likelihood of Marsha Armstrong working a deal was, but I explained that the prosecution would try hard to

18

"flip" Devlin.  Devlin needed to work a deal, because he alone was identified as one of the assailants by the female witness who had been in the room with the deceased at the time that Robert Armstrong and Devlin had begun the fight.  In addition, according to my client, Devlin had not been as involved in the actual fight as Robert had, so Devlin was more palatable to the prosecution.  Finally, Devlin had less reason to resist testifying against Marsha.  Even with those reasons, Mr. Armstrong did not believe Devlin would turn against him.  (It took longer than expected, but ultimately in August of 2007, we learned that Devlin had agreed to testify for the prosecution.)

Mr. Armstrong had been willing to plead guilty, but refused to consider any prison time, only a probation sentence, which he was never offered.

CAUSE OF DEATH INFORMATION COMPLAINT

Mr. Armstrong complains that I did not sufficiently inform him of the medical examiner's conclusions and that this resulted in him erroneously entering his plea of guilty.

**Response:** On the contrary, both before and after interviewing Dr. Krouse in May of 2007, I did discuss the cause of death information with my client.  I informed Mr. Armstrong that I questioned Dr. Krouse about whether the "blunt force traumatic injuries" that he found could have been caused by accidently falling off the sloped low water crossing onto the drainage area below.  (At our meeting, we reviewed both police pictures and the medical examiner's photos.)

Concerning the 8 broken ribs of the deceased, in his opinion, it was unlikely that they occurred from the fall, because if the fall had caused the breaking of the ribs, there would have been injuries to one or both of the arms of the deceased.

With regard to the head injury, he told me that if the injury [had] been caused by falling off the roadway,

there would have been external injuries to the head,
such as a cracked skull and other external injuries.
There were none. In addition, he found evidence of at
least two blows to the head, one each on either side of
the head.

From my discussion with him, it was apparent that his
medical opinion did not agree with my working
hypothesis that Mr. Hughett was not mortally wounded in
the fight, but must have tried to walk away from the
area in which he had been left, and in the complete
darkness, reached the steep slope of the low water
crossing and fallen, suffering the cause of death by
the fall. All of this I reported to my client months
in advance of the December trial date and discussed
with him prior to August.

From my discussion with him, it was apparent that his
medical opinion did not agree with my working
hypothesis that Mr. Hughett was not mortally wounded in
the fight, but must have tried to walk away from the
area in which he had been left, and in the complete
darkness, reached the steep slope of the low water
crossing and fallen, suffering the cause of death by
the fall. All of this I reported to my client months
in advance of the December trial date and discussed
with him prior to August.

DISCUSSION OF ELEMENTS OF CHARGES

Mr. Armstrong claims that he did not receive sufficient
information about the charge of Murder or Aggravated
Kidnapping. I understand his statement to mean the
wording (elements) of the indictment(s) accusations as
distinguished from the acts which the prosecution would
attempt to prove at trial.

**Response:** We spent much of August, 2007 in trial
preparation for a trial setting in late August of 2007.
I discussed with Robert the impact of his third
indictment – and my belief that the Aggravated
Kidnapping count was the result of the prosecution
learning from co-defendant Devlin Finley that the [sic]

20

Mr. Hughett was not dead when he was taken from the
house to the remote area.  Although Mr. Armstrong is
not an expressive person, he was genuinely surprised
that Finley had turned on him.  I explained to Mr.
Armstrong that Finley's testimony would take away any
question of whether the state could prove that
Armstrong had inflicted some type of injuries on
Hughett.

I also discussed with him how the Aggravated Kidnapping
charge put more pressure on him at trial, since it gave
the state another way of convicting him of a first
degree felony, even if the jury could not agree with
the state on the murder charges.  We went over the
elements of the aggravated Kidnapping count, but he had
a hard time grasping how his actions could fit his own
preconception of the crime of aggravated Kidnapping.

In the preceding months, I had on different occasions
discussed the indictment charges of Murder.  He
understood the charge of intentionally or knowingly
causing the death of Mr. Hughett.  We had many times
discussed what evidence we could present that would
help to rebut arguments that, although he learned of
his mother's complaint that she had been both
physically and sexually assaulted by Mr. Hughett (and
that the police had done nothing about it) a week
before he confronted Hughett, that he did not intend to
kill Hughett when he confronted him and that he never
intended to kill Hughett at any point.

Almost every discussion of what happened and what the
state's and the defense evidence and testimony might
show, involved a discussion of the Murder Counts of the
various indictments that charged him with causing the
death of Hughett by acts clearly dangerous to human
life.  He certainly acknowledged that his height of 6
ft. 4 inches and weight of approximately 250 lbs. gave
him the appearance of a powerful person.  He outweighed
the deceased by 100 pounds, was at least 5 inches
taller and was at 27 years of age, 14 years younger.
He did not dispute that he had great strength, but he
was reluctant to believe he could have killed Mr.

Hughett by punching and kicking him, in part, because
he believed himself to be a person slow to anger.

Mr. Armstrong admitted to me that he had become
increasing [sic] agitated as he learned of more abuse
of his mother from the hands of Hughett. He admitted
that it "ate" on him over the week before the fight,
until his concern and anger made him decide to confront
Hughett. He stated that he wanted Devlin (also a large
man at 6 ft 3 inches height) to back him and to help
intimidate Hughett. Armstrong also admitted to having
punched Hughett in the ribs multiple times and to have
kicked Hughett in the head, when Hughett was on the
floor. Armstrong stated that his shoes were heavy-
soled work shoes or boots. He also said that Devlin
had hit and kicked Hughett in the head and body, both
while Hughett was upright and also while he was laying
on the floor. (Mr. Armstrong understood the concept of
parties and how in this instance, Devlin's actions
could be used by the prosecution against him.)

In my interview of Devlin, I learned that he had
informed the prosecution that at one point, he returned
to the room of the assault to find Armstrong kicking
Hughett on the floor. He says he told Robert "that's
enough."

Mr. Armstrong further admitted that after the fight,
that he could tell that Hughett was in pain as he lay
holding his side and mumbling. The mumbling seemed to
last for a long time and he understood only a little of
what Hughett said, such as, "Oh God, I'm hurt." He
also described that Hughett was carried out of the
house and to the truck by Devlin holding his feet and
Armstrong holding his arms.

Mr. Armstrong explained that he grew afraid when Foster
told him that when Hughett got up, he would kill Foster
and Marsha Armstrong. Armstrong feared that he had
made thing worse for his mother and even considered
that Hughett might try to take revenge on Robert by
coming to his family's house and trying to kill him.
This was stated twice to me by my client. We discussed

how all of this would appear to a jury, and how the
prosecution could use this as evidence of a formed
intent at that point to see that Hughett did not live
to take revenge.

We discussed how character witness testimony to his
peaceful nature would be needed to try to blunt the
circumstances of his acts.

Over time, it appeared to me that Mr. Armstrong
understood of what was meant by "with intent to cause
serious bodily injury" and an "act clearly dangerous to
human life" and how that definition of Murder did not
require the intent to cause the death of Mr. Hughett,
but was murder under Texas law, nonetheless.

At his punishment hearing testimony in April, 2008, Mr.
Armstrong evidenced no confusion on what he had
acknowledged in his plea of guilty four months earlier.
He agreed that he had inflicted the injuries that
caused Hughett's death and that he was responsible for
the death.  He admitted to forming the intent to
inflict serious bodily injury on Hughett "during the
fight."  When the prosecutor asked him if he had beaten
Hughett "within an inch of his life," Armstrong
responded, "I did."  Armstrong admitted kicking Hughett
in the ribs 5 times and with a "very hard" force and
"probably" as hard as he could.  He testified that he
had hit Hughett in the head multiple times and admitted
that the brain damage (testified to by Dr. Krouse)
"could have come from my blows."

DISCUSSION OF PLEA OPTIONS

Mr. Armstrong claims that he was rushed into making his
plea and that he had insufficient information to make
his decision.

**Response:** As I have discussed above, the 18th month of
representation, we had gone over his version of the
facts and his potential testimony many times before the
December trial date.  My office had previously put him
on standby to come in for another testimony preparation

and confirmed the appointment for Saturday.  I asked
that his father accompany him on this occasion.

On Friday of the week before trial, I was at the
prosecutor's office to confirm that all discovery had
been provided.  In the course of that conversation, the
prosecutor asked me about the possibility of if [sic]
my client pleading open to the Court without benefit of
[a] plea bargain agreement.  While doubtful of my
client's agreement to such, we discussed various
aspects of how this might be structured.  I tried to
bargain down to a plea of second degree kidnapping, but
was unsuccessful.  I understood this discussion was not
a formal offer, as my client had rejected all previous
offers and an invitation to testify on behalf of the
state, but as something that if desired by my client,
would be agreeable to the prosecution.

When I met with Mr. Armstrong and his father the next
day, I discussed this option first with Mr. Armstrong
alone, as my client had been reluctant to discuss the
idea of an open plea with his father and wife and that
I would rather answer questions of his father now.  Mr.
Armstrong agreed to involve his father in the
discussion and Charles Armstrong joined us.  (I invited
Robert's wife to join us, but either her work schedule
or child caring issues prevented him from attending.)

We spent many hours going over the new consideration.
We revisited the concerns we had of how a jury would
react to the gruesome photographs of Mr. Hughett's
decomposed and scavenged body.  They both were aware of
how this can inflame a jury and can have a negative
effect [on] our defense or mitigation of punishment
efforts.  It was my opinion that a judge was more
likely to be desensitized to these types of photographs
and descriptions than a jury.  However, I repeated my
belief that if this case were still pending before the
original trial judge, that I would advise against an
open plea, because of the former judge's reputation for
severe punishment.  The original judge, however, had
retired during the pendency of this case.  The current
judge had previously been both a local district court

judge and a defense attorney in private practice, before whom I had tried cases and who did not have a reputation for severe punishment. I tried to carefully explain that a very great downside to pleading open was the severe limitation on appeal grounds of the judge's punishment decision, if we were unhappy with his ruling.

I explained that the potential arrangement that the prosecutor would be receptive to would require a plea of guilty to one of the murder paragraphs or to the aggravated kidnapping count; all other counts and paragraphs would be waived permanently and the other two indictments would be dismissed with prejudice against ever refiling. We would insist that Mr. Armstrong continue on bond while a Pre-Sentence Investigation Report was prepared and it was estimated that the punishment hearing would not take place until late spring. We would keep our option to have live testimony from character witnesses at the punishment hearing, as I was unwilling to rely on the PSI Report alone.

Contrary to Mr. Armstrong's complaint, we not only discussed the Aggravated Kidnapping count at length, but I suggested that it might be more acceptable to him. Mr. Armstrong was unmoved on that course and rejected my suggestion. I knew that he would not plead to the intentional murder pleading, so discussion focused on the murder by act clearly dangerous to human life. We again went through the facts of the case and the anticipated evidence that the state would rely on to ask for a conviction for murder and for aggravated kidnapping, as well as the evidence tampering count. We revisited the autopsy evidence and what I anticipated from Dr. Krouse's testimony. We discussed the deadly weapon finding and the effect on any prison sentence, should that be the judge's decision. After a very long discussion of all aspects of this course of action, Robert and his father left without having made [a] final decision. I cannot remember exactly when Robert told me that he would enter a plea of guilty on the Paragraph 2 version of murder; however, I do know

that I worked Sunday on trial preparation.  Mr. Armstrong was not deprived of family input in making this decision and he was given as much time to make his decision as I could give him, since this option had developed only late Friday afternoon.

In the weeks following his plea, Mr. Armstrong and I met to prepare for the PSI interview.  We went over his position and questions for the interview.  I accompanied him during the interview and we independently reviewed the PSI report for corrections that were placed in the record.  We prepared further for his testimony at the punishment hearing and I went over with him the character witness testimony.  During the roughly four months intervening between his plea and the punishment hearing, Mr. Armstrong never indicated that he would like to withdraw his plea.

**Ground Two: Trial Counsel failed to familiarize himself with the applicable law and failed to investigate the case.**

**Response:** Applicant puts great emphasis on the response of Dr. Krouse to the prosecutor's question of, "How severe of a head injury are we looking at?"  Dr. Krouse answered, "In the realm of a, say, a fall from 8 to 10 feet or so onto a hard surface."  From that, applicant concludes that Dr. Krouse is testifying that the head injury came solely from the fall of the deceased off the low water crossing onto the drainage area and therefore, pursuant to Penal Code 6.04, that the conduct of Robert Armstrong was clearly insufficient to have produced the decease's death.

I refer to my above stated investigation into the cause of death with Dr. Krouse.  Dr. Krouse did not testify nor conclude that the fall from the roadway to [the] bottom of the ravine caused the head injury.  Instead, he was stating a description of an *equivalent* amount of force.  (In fact, Applicant's wording uses the correct description of "equivalent" in his complaint.)  As previously stated, Dr. Krouse expressly told me that he did not believe the fall was the cause of the head

26

injury for the reasons noted above, that there would have been external injuries to the head, such as a cracked skull and other external injuries. I did not cross-examine Dr. Krouse on the phraseology he used to described [sic] the force needed to cause the brain injuries, because I already knew that Dr. Krouse's answer would not be helpful to Mr. Armstrong.

**Response** to Charles Armstrong affidavit:

At the beginning of my representation, I explained to Charles Armstrong that although he was paying most if not all of my fee, that as the client, his son would make the decisions about his own case. I also warned both my client and his father that statements by Robert to family and friends about the issues relevant to the charges were not privileged and that the potential existed that they might have to reveal defendant confidences, if the person were called as a witness.

In addition, Robert Armstrong had directed me to not discuss with his father case facts that had not been made public. Robert's mother and father had been divorced while Robert was young. Robert and his brother had grown up under trying circumstances with their mother, co-defendant Marsha Armstrong. At some past time, there had been a contentious custody battle between Robert's mother and father. It was evidence from Charles Armstrong that he regretted that his sons had been under the influence of their mother and felt that they had both been harmed by her parenting.

In an effort to be better able to distance Robert from his co-defendant mother at a trial, should that be necessary, I spoke with Mr. Armstrong, his father, his brother and his wife and other potential witnesses about Marsha Armstrong's parenting of her sons and about her lifestyle. The reports that I received were not good and lead me to conclude that Robert had assumed the role of the parent to his mother as a young man. Robert was keenly aware of his father's attitude regarding his mother, but he consistently defended his mother against negative accusations.

27

As Robert's attorney, it was clear that Robert kept his relationship with his mother separate and private from his relationship with his father.  Since Robert's criminal problems came from being involved in his mother's "rescue," Robert was reluctant to involve his father in any more of his legal affairs than necessary and I had to respect his wishes.  Throughout my representation of Robert Armstrong, misconceptions arose on Charles Armstrong's part and they had to be dealt with as best I could within the bounds of my client's instructions.

As to Charles Armstrong's assertions, I believe that I have answered the majority above, but I shall address specifically the following:

I never told either my client or his father that there was no choice but to plead guilty, nor did I tell either Charles Armstrong or my client that Robert should plead guilty.

I never told either my client or his father that I knew that Robert would be found guilty if we tried this case.  Nor did I presume to tell them that he "would" receive a probation or what number of years sentence he would receive from the judge if he plead guilty.  In discussing the possibilities, I did tell them that if [we] were fortunate enough to get deferred adjudication, that Robert might have to spend time in county jail as a condition of the deferred adjudication.

As is evident from Charles Armstrong's statement, he is a person of strong opinions.  This [is] why I asked my client about including his father in the discussion about pleading guilty.  I have previously addressed the time considerations for making a decision that existed; while not ideal, I did not place any limitations on my client's decision making that were not placed by the short time frame in which the option arose.

As to Charles Armstrong's assertion that he does not believe Mr. Finley made a statement against Robert,

28

Robert was present at my office when I interviewed Mr.
Finley by phone.  I had planned on Robert listening to
the conversation on speaker phone in my office with the
investigator and myself, but Finley's attorney objected
to that arrangement and I had to comply.  Mr. Armstrong
went to another room during the interview, but
immediately afterward, Mr. Ladd, Robert Armstrong and I
talked about what Finley had said.  Later, after the
transcript was typed, I went through it line by line
with Mr. Armstrong.

Charles Armstrong has erroneously characterized my
instructions to the character witnesses.  As I do with
any character witness at a punishment stage, I
explained that our intent is for them to testify to the
good character and characteristics of Robert Armstrong,
even in the face of the plea of guilty.  They would not
be asked for their opinion of Robert's guilt and that
their testimony would be severely discounted in the
eyes of the judge if their opinion of Robert's
character were based on him being innocent of the
charges.

I probably did not talk with Charles Armstrong about
how the judge could refuse to accept the plea if he
believed that the [sic] Robert Armstrong did not intend
to plead guilty, but I did explain that to Robert.

SH 62-72, ECF No. 10-10 (citations to the record omitted).

     The state trial court entered factual findings consistent

with counsel's affidavit in conjunction with the documentary

record and concluded that petitioner had not overcome the

presumption of regularity with respect to guilty pleas under

state law, that petitioner was properly admonished regarding the

consequences of his guilty plea and the full range of punishment

for the offense, and that petitioner had failed to prove that his

plea was not freely, voluntarily, and knowingly entered.  SH 104-05, ECF No. 10-10.  Applying the familiar *Strickland* standard, the state court further concluded that counsel properly familiarized himself with the facts of the case and the applicable law and properly ascertained the correct posture of the case and that counsel's advice to plead guilty was a reasonable decision made after a thorough investigation.  SH 105-06, ECF No. 10-10.  The Texas Court of Criminal Appeals denied relief on the habeas court's findings.

Petitioner has failed to present convincing evidence or compelling argument to rebut the presumption of correctness of the state court's factual findings.  Thus, applying the presumption of correctness, the state courts' denial of petitioner's claims is not contrary to, or involve an unreasonable application of relevant Supreme Court precedent.  A guilty plea is voluntary, knowing, and intelligent if done with sufficient awareness of the relevant circumstances and likely consequences surrounding the plea.  *Brady v. United States*, 397 U.S. 742, 748 (1970).  If a challenged guilty plea is knowing, voluntary, and intelligent, it will be upheld on federal habeas review.  *James v. Cain*, 56 F.3d 662, 666 (5th Cir. 1995).  Although a defendant's attestation of voluntariness at the time

30

of the plea is not an absolute bar to later contrary contentions, it places a heavy burden upon him. *United States v. Diaz*, 733 F.2d 371, 373-74 (5th Cir. 1979).

The record reflects that petitioner entered his guilty plea in open court and was advised by counsel and the trial court of his rights, waivers, and the full range of punishment for the offense. SH 132-36, ECF No. 10-10. Petitioner executed the written plea admonishments in which he acknowledged that he understood the written plea admonishments, that he was aware of the consequences of his plea, that his plea was knowingly, freely, and voluntarily entered, that no one threatened, coerced, forced, persuaded or promised him anything in exchange for his plea, that he was "totally satisfied" with the representation received from counsel and that counsel provided "fully effective and competent representation." Additionally, petitioner judicially confessed to committing the offense of murder as charged. *See Blackledge*, 431 U.S. at 74; *Kelley v. Alabama*, 636 F.2d 1082, 1084 (5th Cir. 1981). Such representations by a defendant during plea proceedings "carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74.

Counsel's obligation is to inform a criminal defendant of the advantages and disadvantages of a plea agreement and the

31

attendant statutory and constitutional rights that a guilty plea would forgo. *Libretti v. United States*, 516 U.S. 29, 50-51 (1995). A plea is not rendered involuntary simply because a defendant received a greater punishment than he anticipated or did not assess every relevant factor when making his decision. *Daniel v. Cockrell,* 283 F.3d 697, 703 (5th Cir. 2002). Often a criminal defendant, even if he is unwilling or unable to admit his guilt, will agree to plead guilty to an offense, having been so informed by counsel, in order to avoid a potentially harsher sentence. Such a decision on the part of a defendant does not render counsel's representation deficient or a plea involuntary. *North Carolina v. Alford*, 400 U.S. 25, 37 (1970); *Brady v. United States*, 397 U.S. 742, 749-50 (1970). It appears counsel advised petitioner in good faith that he felt a guilty plea would result in a lighter sentence based on his experience in the trial court and his experience with juries. Such advice does not strip a petitioner's plea of its voluntary nature. Petitioner decided to enter a guilty plea in the hope that he would receive as lenient a sentence as legally possible. Merely receiving a greater sentence than hoped for does not render a guilty plea involuntary nor is it a proper basis for the withdrawal of a guilty plea. *United States v. Rodriguez,* 62 F.3d 723, 725 (5th Cir. 1995).

32

A voluntary, knowing, and intelligent guilty plea waives all nonjurisdictional defects in the proceedings against a defendant preceding the plea, including all claims of ineffective assistance of counsel that do not implicate the voluntariness of the plea. *Beasley v. McCotter*, 798 F.2d 116, 118-19 (5th Cir. 1986); *Smith v. Estelle*, 711 F.2d 677, 682 (5th Cir. 1983). Because petitioner's plea was knowing and voluntary, his claim that counsel failed to properly investigate is waived.[4] *Smith v. Estelle,* 711 F.2d 677, 682 (5th Cir. 1994); *Clarke v.Cain*, 85 F.3d 624, 1996 WL 255287, at *2 (5th Cir. May 1, 1996).

In summary, the record supports the state courts' determination of the issues presented in this federal proceeding. The state courts' adjudication of the claims is not contrary to

---

[4]The claim also lacks merit. While it is true that an attorney must engage in a reasonable amount of pretrial investigation, the record reflects counsel obtained a court-appointed investigator, visited the crime scenes, interviewed witnesses, reviewed police and investigative reports and witness statements, investigated alternate theories of the crime, weighed the evidence and the likelihood of success before formulating his strategy, conferred with petitioner and his family, and consulted with the medical examiner regarding the very defensive theory petitioner now espouses. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691; *Mattheson v. King,* 751 F.2d 1432, 1439-40 (5th Cir. 1985); *Bell v. Lynbaugh,* 828 F.2d 1085, 1088 (5th Cir. 1987). However, counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers." *Lovett v. Florida,* 627 F.2d 706, 708 (5th Cir.1980). Counsel conducted a thorough independent investigation in preparation of trial. Counsel had no reason to believe further investigation into the theory that the victim died from a fall might be fruitful. *Andrews v. Collins,* 21 F.3d 612, 623-24 (5th Cir. 1994).

or involve an unreasonable application of clearly established federal law, as determined by the Supreme Court, in light of the record as a whole.  Accordingly, it is entitled to deference and the presumption of correctness.

For the reasons discussed herein,

The court ORDERS the petition of petitioner for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and is hereby, denied.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court, and 28 U.S.C. § 2253(c), for the reasons discussed herein, the court further ORDERS that a certificate of appealability be, and is hereby, denied, as petitioner has not made a substantial showing of the denial of a constitutional right.

SIGNED September ___, 2014.

_____
JOHN McBRYDE
UNITED STATES DISTRICT JUDGE